U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2005 NOV 29 PM 1 41

CLERK
BY _____
DEPUTY CLERK

| | |
|---|---|
| ELIZABETH BONNIE AKERLEY, | Case No_____ |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| v. | 2:05·cv·314 |
| NORTH COUNTRY STONE, INC., JOHN BYORS, RACHEL BYORS, VERMONT MARBLE INVESTORS GROUP, INC., VERMONT MARBLE INTERNATIONAL, LLC, BARNEY MARBLE COMPANY, INC. and RICHARD E. HEARN, | |
| Defendants. | |

Plaintiff Elizabeth Bonnie Akerley, by and through counsel of record, for her complaint against the above-named defendants, states:

## I. Nature Of The Action

1.      This civil action is being commenced to obtain relief for numerous violations of law arising out of a continuing scheme to defraud the investing public through the offer and sale of fraudulent promissory notes -- a growing criminal practice that is now so widespread Vermont securities regulators place it fourth on their list of top ten investment scams.  The criminal masterminds who conceived and implemented the fraud are defendant John Byors ("Byors") and a Massachusetts attorney who has since been disbarred and declared a bankrupt, Jon Conant ("Conant").  The plaintiff, a divorced mother of two minor children, was one of Conant's clients, as were the other victims of the fraud identified in this complaint.  Joined with Byors as defendants are:  North Country Stone, Inc. ("NCS"), Vermont Marble Investors Group, Inc.

Page 1 of 41

("VMIG"), and Vermont Marble International, LLC ("VMI"), Vermont shell entities formed by Conant and Byors to further the fraud; Rachel Byors, Byors' spouse, who was an officer of NCS, VMIG and VMI; Barney Marble Company, Inc. ("BMC"), record owner of the Vermont marble quarry that is at the center of the scam; and Richard E. Hearn ("Hearn"), a long-time business consultant to Byors.

2.     The claims asserted include numerous violations of federal and state securities laws; in the alternative, conducting the affairs of an "enterprise" through a "pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"); statutorily proscribed unfair and deceptive acts and practices; and numerous common law causes of action, including civil conspiracy. The plaintiff seeks a final judgment awarding her the $615,000.00 that she was fraudulently induced to invest (minus returns totaling $32,000.00), pre and post-judgment interest, costs, attorney's fees and expenses, and an award of statutorily enhanced or punitive damages.

3.     The plaintiff also seeks interlocutory relief to obtain security for any final judgment that may be entered in her favor through the issuance of prejudgment attachments of the non-exempt real estate, goods and chattels, and other property of the defendants to the value of $1,000,000.00. The non-exempt real estate for which nonpossessory attachments are requested includes: (1) a 150 acre parcel of undeveloped land titled to Byors that adjoins the marble quarry and was purchased utilizing fraudulently obtained investment funds, (2) a second 60 acre parcel of undeveloped land titled to Byors and his wife as tenants by the entirety that adjoins the quarry and also purchased with fraudulently obtained investment funds, (3) the Swanton Red Quarry titled to BMC, which received substantial payments made with fraudulently obtained investment funds (a) in consideration of its sale to Byors of an exclusive (never-exercised) option to

purchase the $75,000.00 quarry at the grossly inflated purchase price of $4,000,000.00, and (b) as rent due pursuant to the undisclosed terms of a written lease that authorized VMIG's purported mining operations at the quarry, and (4) residential property titled to Hearn that was improved substantially with fraudulently obtained investment funds wrongfully diverted to Byors' personal use. In addition, the plaintiff requests that the Writ command the appropriate officer to take possession of several marble blocks identified to defendant VMIG and four valuable automobiles currently registered to Byors.

II. Parties

4.      The plaintiff is a citizen of Massachusetts and a resident of Gloucester, Massachusetts.

5.      At all times relevant to this action, NCS was a business corporation organized and operating under the laws of Vermont, with its principal place of business in Burlington, Vermont. NCS was formed as a close corporation without directors. NCS was terminated by the Vermont Secretary of State on May 18, 2004.

6.      Byors is a citizen of Vermont last known to reside in Williston, Vermont. Byors was an officer and shareholder of NCS at all times relevant to this action.

7.      Rachel Byors is a citizen of Vermont. She is married to Byors and last known to reside with him in Williston, Vermont. On information and belief, Rachel Byors was an officer of NCS at all times relevant to this action.

8.      VMIG was a business corporation organized and operating under the laws of Vermont, with its principal place of business in Burlington, Vermont. Byors was an officer, director and shareholder of VMIG at all times relevant to this action. Rachel Byors was an officer of VMIG at all times relevant to this action. VMIG was terminated by the Vermont

Secretary of State on June 10, 2005.

9.     VMI was a limited liability company organized and operating under the laws of Vermont, with its principal place of business in Burlington, Vermont. Byors was a member and the manager of VMI at all times relevant to this action. On information and belief, Rachel Byors was an officer of VMI at all times relevant to this action. VMI was terminated by the Vermont Secretary of State on June 6, 2005.

10.    BMC is a business corporation organized and operating under the laws of Vermont, with its principal place of business in Proctor, Vermont.

11.    Hearn is a citizen of Florida, last known to reside with the Byors in Williston, Vermont. At all times material to this action, Hearn was a business consultant to Byors.

### III. Jurisdiction And Venue

12.    This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

13.    Specifically, this action is subject to the grant of federal jurisdiction set forth in section 22(a) of the Securities Act of 1933, 15 U.S.C. §77v(a), and section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. The defendants, directly or indirectly, singly and in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

14.    In the alternative, this action is subject to the grant of federal jurisdiction set forth in the RICO Act, 18 U.S.C. § 1964(c).

15.    This Court also has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332, in that this is a civil action where the matter in controversy exceeds the sum or

value of $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between the plaintiff and the defendants.

16.    This Court has original jurisdiction over each and every claim asserted under state law pursuant to the supplemental jurisdiction conferred pursuant to 28 U.S.C. § 1367 and principles of ancillary and pendent jurisdiction.

17.    Venue is proper in this judicial district pursuant to section 22(a) of the Securities Act of 1933, 15 U.S.C. §77v(a), section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

IV.  Factual Allegations

The Plaintiff Is Induced To Invest

18.    In or about December of 2002, the plaintiff learned from her long-time friend, Angelo Zakas ("Zakas"), of an opportunity to invest in a Vermont marble business.  The business was reportedly owned by Conant, who was known to the plaintiff as a Gloucester native who attended Harvard Law School and returned to that blue collar city to establish what was reputed to be a highly-regarded and successful law practice.

19.    When the plaintiff met with Conant and Zakas to learn more, Conant told her that he and Byors, his friend and client, were business partners in a Vermont company that owned and operated several marble quarries.  The company, identified as NCS, was managed by Byors, who was said to be extremely knowledgeable, experienced and successful in the marble industry. One of the quarries was located in Swanton, Vermont.  Conant explained that marble from the "Swanton Red Quarry" was of unusual color and hardness, making it highly desirable and therefore extremely valuable.  He showed the plaintiff photographs of the purported quarry operations and displayed processed marble tiles that were said to be extremely valuable.

20.     Conant went on to explain that NCS needed additional operating capital to pur-
chase equipment and to process marble blocks into finished tile and/or slabs for very profitable
sales to third parties.  He confided to the plaintiff that Byors already had sufficient purchase
orders in hand from Middle Eastern buyers and others to guarantee that investors would double
their money in just one year.

21.     Conant allowed the plaintiff to examine selected excerpts from a comprehensive
written appraisal of the Swanton Red Quarry prepared by Fred Blais Appraiser, Inc. (hereinafter
the "Blais Appraisal").  The Blais Appraisal employed the "income capitalization approach" and,
relying in part on "current" purchase orders provided by Byors with a face value of
$7,768,250.00, projected net annual operating income ranging from $9,248,500.00 in year one to
$19,620,057.00 in year ten.  Based on this projected income stream, the Blais Appraisal placed
the fair market value of the Swanton Red Quarry as of February 9, 2001 at $130,000,000.00.

22.     Conant said he already had created all of the necessary legal documentation and
would generate specific documentation for the plaintiff without charge.  As with other investors,
her investment would be structured as a loan evidenced by a written promissory note.  The note
would be signed not only by NCS, but by Byors and Conant as well.  Pursuant to the terms of the
note, the makers would promise to double the plaintiff's investment in one year.  Additional
legal documentation would insure that, pending payment, she would have a security interest in
raw marble and/or processed marble products of sufficient value to protect and secure the
amount invested.

22.     In reliance on Conant's representations, the plaintiff agreed to invest.  Her initial
investment was in the amount of $50,000.00.  Conant and Zakas encouraged the plaintiff to
invest more money, but she refused to do so unless Zakas invested as well.  When Zakas agreed

to do so, the plaintiff invested considerable additional sums on an incremental basis. All told, between January 2003 and March 2004, she invested $615,000.00. These investments are evidenced by a series of promissory notes and related investment documents, all of which were prepared by Conant.

The Plaintiff's Incremental Investments

### The First And Second Promissory Notes

23.     The plaintiff's initial $50,000.00 investment is evidenced by a promissory note dated January 17, 2003, that had an original principal balance of $50,000.00 and was payable to the plaintiff in the amount of $100,000.00 one year later on January 17, 2004. (This note will hereinafter be referred to as the "First Promissory Note.") In addition to other terms, the First Promissory Note provided that the holder could "elect to reinvest up to the total amount of $100,000.00 for an additional year on the same terms." It also provided that the makers would pay all costs and expenses, including reasonable attorney's fees, should collection proceedings ever prove necessary.

24.     Conant prepared an accompanying bill of sale and two-page investment agreement. Pursuant to the bill of sale, NCS purported to transfer to the plaintiff title to three marble blocks (specifically identified by number) with warranties of unencumbered title. The investment agreement provided that NCS would process the three marble blocks into tile and/or slabs for sale to the public as soon as reasonably possible. The blocks and/or finished materials were to be held at the Swanton Red Quarry or at the tile processing facility located in Stanstead, Quebec, Canada, and kept in good condition and free from all encumbrances. NCS further agreed that it would not allow the materials to be removed from these locations without the plaintiff's consent, except for transport from one to the other or after being paid for their sale to

third parties via irrevocable letter of credit, cash or certified or bank checks drawn on U.S. banks. The agreement also confirmed that the plaintiff would be entitled to payment of $100,000.00 in one year, on January 17, 2004.

25.     Conant also prepared a Memorandum of Understanding, stating:

> As of January 17, 2003 the parties have entered into an agreement whereby Bonnie Akerley has invested $50,000.00 with the other parties to process and sell three marble blocks. In conjunction with this investment, the parties have executed a bill of sale, a promissory note and an investment agreement consisting of two pages. The parties acknowledge that all of said documents relate to a single investment of $50,000.00 and one obligation.

26.     A second promissory note prepared by Conant was also dated January 17, 2003. It had an original principal balance of $50,000.00 and was payable to the plaintiff (60%) and Zakas (40%) in the amount of $100,000.00 on January 17, 2004.  (This note will hereinafter be referred to as the "Second Promissory Note.")  The Second Promissory Note also stated that the holder could "elect to reinvest up to the total amount of $100,000.00 for an additional year on the same terms" and provided that the makers would pay all costs of collection.

27.     Pursuant to a second bill of sale, NCS purported to transfer to the plaintiff (60%) and to Zakas (40%) title to three marble blocks (specifically identified by number) with warranties of unencumbered title.  The terms and conditions of the accompanying investment agreement were identical in all material respects to those set forth in the investment agreement prepared in connection with the First Promissory Note.

28.     Conant executed all of these legal documents as the authorized representative of NCS and also signed the memorandum of understanding, both promissory notes, and both investment agreements in his individual capacity.  As he was then maintaining his personal residence in Vermont near Byors's home, Conant promised that he would personally transport

the documents to Vermont and obtain Byors' signatures.  In the meantime, he left the plaintiff

with copies of the partially executed documents.  Byors subsequently executed the Memorandum

of Understanding, the First Promissory Note, the Second Promissory Note, and the related

investment agreements in Vermont, and Conant delivered copies of the fully executed documents

to the plaintiff in Massachusetts.  (True and correct copies of the First Promissory Note and

related investment documents are attached hereto as **Exhibit 1** and incorporated herein by

reference, and true and correct copies of the Second Promissory Note and related bill of sale and

investment agreement are attached hereto as **Exhibit 2** and incorporated herein by reference.)

The Third, Fourth And Fifth Promissory Notes

29.     The next three investments by the plaintiff and Zakas are evidenced as follows:

Promissory note dated February 14, 2003 (the "Third Promissory Note"), with an original
principal balance of $40,000.00, payable to the plaintiff (62.5%) and Zakas (37.5%) in
the amount of $60,000.00 six months later on August 14, 2003.  (True and correct copies
of the Third Promissory Note and the related bill of sale and investment agreement are at-
tached hereto as **Exhibit 3** and incorporated herein by reference.)

Promissory note dated March 19, 2003 (the "Fourth Promissory Note"), with an original
principal balance of $40,000.00, payable to the plaintiff (37.5%) and Zakas (62.5%) in
the amount of $60,000.00 six months later on September 19, 2003.  (True and correct
copies of the Fourth Promissory Note and the related bill of sale and investment agree-
ment are attached hereto as **Exhibit 4** and incorporated herein by reference.)

Promissory note dated June 5, 2003 (the "Fifth Promissory Note"), with an original prin-
cipal balance of $40,000.00, payable to the plaintiff (75%) and Zakas (25%) in the
amount of $80,000.00 one year later on June 5, 2004.  (True and correct copies of the
Fifth Promissory Note and the related bill of sale and investment agreement are attached
hereto as **Exhibit 5** and incorporated herein by reference.)

30.     The terms of the Third, Fourth and Fifth Promissory Notes were substantially

identical in all material respects to those set forth in the First and Second Promissory Notes, one

exception being the absence of any written option to reinvest for an additional year on the same

terms.  On each of these three subsequent occasions, Conant signed the investment documents on

behalf of himself and NCS, and promised to transport them to Vermont and obtain Byors'
signatures, leaving the plaintiff with partially executed copies. The plaintiff believes that Conant
subsequently delivered fully executed copies of these documents to her, but she could locate only
the partially executed copies attached hereto and does not know with absolute certainty whether
Byors ever executed the Third, Fourth or Fifth Promissory Notes, or the related investment
documentation. Byors did acknowledge and ratify the Third, Fourth and Fifth Promissory Notes,
and the related investment documents, in the Modification And Acknowledgement Agreement
described in paragraphs 38 through and including 40 below.

The Sixth Promissory Note

31.    The Third Promissory Note was due according to its terms on August 14, 2003,
the first of the promissory notes to come due. As that due date approached, the plaintiff was told
that NCS needed more investment capital and additional time to generate sufficient profit to pay
the $37,500 that she was due pursuant to the terms of the Third Promissory Note. The plaintiff
was further told that with additional investment, NCS soon would be in position to pay the full
amount due pursuant to the Third Promissory Note, together accrued interest from the scheduled
due date at the rate of 8 percent per annum, as specified therein. In reliance on Conant's
continuing representations concerning the impending and virtually certain profitability that NCS
would soon enjoy, the plaintiff agreed to invest another $15,000.00, matching the additional
investment that Zakas agreed to make.

32.    Conant prepared a promissory note with an original principal balance of
$30,000.00, payable to the plaintiff (50%) and Zakas (50%) in the amount of $60,000.00 one
year later on August 21, 2004. (This note will hereinafter be referred to as the "Sixth Promissory
Note.") He also prepared a bill of sale and investment agreement with terms identical in all

Page 10 of 41

material respects to the versions executed most recently.

33.     Conant signed the Sixth Promissory Note on behalf of both himself and NCS but executed the investment agreement only in his individual capacity. Byors later signed the bill of sale on behalf of NCS and executed the investment agreement on behalf of both himself and NCS. Conant subsequently delivered copies of the fully executed documents to the plaintiff in Massachusetts. (True and correct copies of the fully executed documents are attached hereto as **Exhibit 6** and incorporated herein by reference.)

<u>The Seventh Promissory Note And The Modification And Acknowledgment Agreement</u>

34.     The due date of the Fourth Promissory, the next note due according to its terms, passed without payment on September 19, 2004. The plaintiff was again told that NCS needed additional time and even more operating capital to assure success. On understanding that Zakas was investing an identical additional sum, the plaintiff agreed to invest an additional $325,000.00. This transaction is evidenced by a promissory note dated January 26, 2004, a chattel mortgage dated January 24, 2004, and collateral assignments of life insurance policies insuring the lives of Byors and Conant.

35.     The promissory note dated January 26, 2004 had an original principal balance of $325,000.00. The note bears interest at the rate of 7.25 percent per annum and provides for payments to the plaintiff at the rate of $1,963.54 per month beginning February 26, 2004, final payment of $326,963.54 on July 26, 2004, and payment of an additional $100,000.00 on July 26, 2004. (This note will hereinafter be referred to as the "Seventh Promissory Note.") The Seventh Promissory Note further recites that it is to be secured by a chattel mortgage on inventory items of the borrower and a collateral assignment of certain life insurance policies.

36.     Pursuant to the terms of the chattel mortgage, the plaintiff was granted a security

interest in ten marble blocks specifically identified by number. Pursuant to the written assignments, term life insurance policies issued to Conant and Byors were assigned to the plaintiff.

37.     The Seventh Promissory Note was executed by Conant on behalf of himself and NCS and signed by Byors in his individual capacity. The collateral mortgage was signed by Byors acting on behalf of NCS. Conant and Byors each signed their respective Assignment of Life Insurance Policy As Collateral. (True and correct copies of these documents are attached hereto as **Exhibit 7** and incorporated herein by reference.)

38.     Also, on or about January 27, 2004, the plaintiff and Zakas entered into a written agreement with NCS, Byors and Conant (hereinafter the "Modification And Acknowledgment Agreement"). Pursuant to the terms of this agreement the parties agreed as follows:

> All principal and interest in connection with the First Promissory Note would be rolled over and deemed re-invested for another year on the same terms, with the sum of $200,000.00 due and payable on January 17, 2005.
>
> Upon payment of $30,000.00 to the plaintiff and $20,000.00 to Zakas, the $50,000.00 principal amount evidenced by the Second Promissory Note would remain in place on the same original terms, with the sum of $100,000.00 due and payable on January 17, 2005 (to be divided according to proportionate share).
>
> Upon payment of interest due at maturity, the Third Promissory Note was extended for one year from the original due date, with the sum of $80,000.00 due and payable on August 14, 2004.
>
> The Fourth Promissory Note was extended until September 19, 2004.

39.     Also pursuant to the Modification And Acknowledgment Agreement, NCS, Byors and Conant acknowledged that the plaintiff incurred a pre-payment penalty to obtain the funds to make her additional $325,000.00 investment on January 26, 2004, that NCS had agreed to pay all of the plaintiff's expenses associated with that investment, including the pre-payment penalty, and that the parties would negotiate the terms of that payment when the specific terms of the pre-

payment penalty actually became known.

40.    The Modification And Acknowledgment Agreement was executed by Byors on behalf of himself and NCS and was signed by Conant in his individual capacity. (A true and correct copy is attached hereto as **Exhibit 8** and incorporated herein by reference.)

The Eighth And Ninth Promissory Notes

41.    The plaintiff's final two investments in the business are evidenced by promissory notes dated February 20 and March 5, 2004. The promissory note dated February 20, 2004 had an original principal balance of $50,000.00 and was payable to the plaintiff in the amount of $100,000.00 on February 20, 2005. (This note will hereinafter be referred to as the "Eighth Promissory Note."). The promissory note dated March 5, 2004 had an original principal balance of $50,000.00 and was payable to the plaintiff (50%) and Zakas (50%) in the amount of $100,000.00 on March 5, 2005. (This note will hereinafter be referred to as the "Ninth Promissory Note.")

42.    Each of the accompanying bills of sale purported to transfer to the plaintiff title to three marble blocks (specifically identified by number) with warranties of unencumbered title. The terms of the investment agreements accompanying the bills of sale were substantially identical in all material respects to those previously executed.

43.    The Eighth Promissory Note and the related investment documents are signed by all parties. (True and correct copies are attached as **Exhibit 9** and incorporated herein by reference.) The copies of the Ninth Promissory Note and the investment agreement in plaintiff's possession are not signed by Byors, nor are they signed on behalf of NCS, and the plaintiff does not know with absolute certainty whether those documents were ever fully executed, although she believes they were. (Copies of the documents in the plaintiff's possession are attached as

Exhibit 10 and incorporated herein by reference.)

**Byors And NCS, Through Conant And Otherwise, Made Numerous Untrue Statements Of
Material Fact And Omitted To State Material Facts Necessary To Avoid Misleading Plaintiff**

44.    In their dealings with the plaintiff, and for the purpose of inducing her invest-
ments, Conant, Byors and NCS made numerous untrue statements of material fact, and omitted
to state material facts necessary to make statements that were made, in light of the circumstances
under which they were made, not misleading, concerning each of the topics described below,
among others.

**Byors Had No Experience In The Marble Industry, And Neither Conant Nor
Byors Owned Or Controlled Any Business That Owned Any Marble Quarries**

45.    The plaintiff was told by Conant at the first meeting and at various times thereaf-
ter that Byors was extremely knowledgeable, experienced and successful as an owner and
operator of quarries. This was not true. Byors is a former hairdresser with little or no experience
in the marble industry.

46.    The plaintiff was told by Conant at the first meeting and at various times thereaf-
ter that NCS was the owner of working marble quarries, including the Swanton Red Quarry.
This was untrue. To the plaintiff's knowledge, neither NCS nor any other business entity owned
or controlled by Conant or Byors owned any marble quarries, much less working ones. The
Swanton Red Quarry was, and still is, owned by BMC.

**Material Facts Concerning BMC Were Concealed From The Plaintiff**

47.    All material facts concerning BMC were concealed from the plaintiff. BMC pur-
chased the Swanton Red Quarry in April 2000 from OMYA, Inc., one of the largest commercial
mining entities in the world, and the operator of several Vermont quarries. The purchase price in
that arms-length transaction was only $75,000.00, the fair market value of the quarry at the time.

48.    Only six weeks after BMC's purchase, BMC and Byors entered into a series of transactions evidenced by written instruments dated June 12, 2000.  BMC granted Byors an exclusive, five-year option to purchase the quarry for a purchase price of $4,000,000.00.  BMC also agreed to supply Byors with "all of the marble quarried from the Swanton Quarry for a five year period provided that [Byors] makes a minimum purchase of $800,000.00 worth of material per year."  The agreement specified that BMC was to mine, extract and ship the marble at agreed prices.

49.    By its terms, Byors' option to purchase was to become null and void if the $200,000.00 was not paid to BMC on or before January 1, 2001.  To ensure that the option could be terminated in the event the $200,000.00 was not paid, Byors had executed and delivered a Release and Discharge of the option to be recorded in the event of non-payment.  The Release and Discharge has never been filed, and on information and belief, the $200,000.00 was paid to BMC in December 2000 with funds that Conant embezzled from his law office trust account.  Conant was disbarred by the Commonwealth of Massachusetts in 2005.

50.    On or about February 28, 2001, the supply contract between BMC and Byors was replaced by a written lease between BMC and VMIG.  Pursuant to the lease, VMIG was authorized to perform all mining operations at the Swanton Red Quarry.  Also on February 28, 2001, BMC accepted and ratified in writing Byors' assignment of the exclusive option to purchase to VMIG.

### The Swanton Red Quarry Was Not Operational, Had Not Seen Any Substantial Activity In Over Forty Years, And Was Unlikely To Operate At A Profit In The Future

51.    The Swanton Red Quarry had been inactive for at least four decades prior to its sale to BMC.  Neither BMC (pursuant to the supply contract) nor VMIG (pursuant to the

superseding lease) ever engaged in any significant mining activity at that location. Certainly the quarry could not fairly be described as having been fully operational at any time from or after the date the plaintiff first invested. At or about the time the plaintiff was induced to invest, the Swanton Red Quarry was abandoned, and the access roads are now overgrown and all mining equipment has been removed from the site.

52.     The reason for the lack of quarrying activity was well known to the defendants: the costs associated with extracting, processing and shipping marble from the Swanton Red Quarry were simply too high to be competitive in the global market place. This undoubtedly accounted for Byors' apparent inability to comply with the minimum purchase requirements imposed by the supply contract with BMC, leading to its replacement with the lease to VMIG. And this presumably is why the Swanton Red Quarry was not actively worked for any substantial period of time by VMIG or any other business owned or controlled by Conant or Byors, notwithstanding substantial and continuing rent payments to BMC.

The Appraisal Excerpts Were Materially False And Misleading

53.     The plaintiff was supplied by Conant with excerpts from the Blais Appraisal. These appraisal excerpts represented that the defendants held purchase orders with a face value of $7,768,250.00, supporting projected net annual operating income ranging from $9,248,500.00 in year one to $19,620,057.00 in year ten and justifying valuation of the Swanton Red Quarry at $130,000,000.00. These written representations were materially false and misleading. At best the so-called purchase orders were proposals or quotes to provide material in the future at a specified price. The projects for which the alleged purchase orders were placed were never built, the purchase orders were not *bona fide*, and the then-current value of the quarry was only about $75,000.00.

### The Makers Had No Ability Or Intention To Pay The Promissory Notes

54.     The plaintiff was offered and sold notes that promised high, fixed-rate returns, in most cases promising to return double her investments in only one year. On or about the dates set forth in the notes and associated documentation, Conant represented that he and John Byors would personally sign the note along with NCS. Each note was materially misleading because NCS was a mere shell corporation not actively engaged in quarrying or processing marble, from the Swanton Red Quarry or elsewhere, and had no realistic prospects for doing so in the future. NCS thus had no realistic ability to pay the notes, and neither Conant nor Byors ever intended to pay the notes.

### Conant Concealed That The Promised Interest Was Legally Unenforceable

55.     Conant, a Massachusetts attorney experienced and knowledgeable in financing and lending transactions, concealed from the plaintiff that because the interest rate of 100 percent per annum had not been reported to the Attorney General of the Commonwealth of Massachusetts, any recovery on the notes would be limited by law to the recovery of principal only pursuant to the provisions of Massachusetts General Law, Chapter 271, section 49. Conant intentionally assigned an excessive rate of interest and intentionally failed to report these transactions to the Attorney General for the purpose of ensuring that the notes would by operation of law not generate interest.

### By The Time Plaintiff Invested, The Makers Were Already In Default To Other Investors

56.     Between June 30, 2001, and June 15, 2002, Holly Cain and her friend Frederick Blatchford invested a total of $118,000.00 in the quarry operations pursuant to the terms of six fraudulent promissory notes, each of which promised to double their principal investments in one year. Cain also persuaded her brother and cousin to invest.

57.     At various times the plaintiff was induced to invest, some or all of the above-described loans were already in default.  While Holly Cain's brother and cousin ultimately were paid, the notes to Cain and Blatchford remained in default throughout the time the plaintiff made incremental investments.  On or about April 5, 2005, Cain and Blatchford initiated suit against Byors in Massachusetts, <u>Cain et al v. Byors</u>, Essex Superior Court, C.A. No. 050505 (Mass.).  Byors was defaulted on May 18, 2005.

58.     Conant also persuaded Hilda Ayer-Anderson, a client in her late seventies suffering from a variety of infirmities, to invest in the quarrying operations.  These investments were made with Byors doing business as "Westside Marble" and were evidenced by promissory notes dated June 14, 2001, and January 15, 2002.  The funds came from Mrs. Anderson's charitable foundation, the Ayer-Anderson Foundation, a Massachusetts non-profit corporation of which Conant was a trustee.

59.     At various times the plaintiff was induced to invest, one or both of the above-described loans were already in default.  In addition, during 2003, Mrs. Anderson and the Foundation sued Conant and Byors for fraud in Massachusetts.  The Foundation subsequently brought suit against Byors in Vermont on the notes.  All claims against Byors in both Massachusetts and Vermont were dropped in 2004, following his compliance with the terms of settlement in the Vermont action.

60.     Conant and Byors concealed from the plaintiff the existence of these defaults, the suits, and the settlement.

### The Security Was Either Fictitious Or Sold Or Pledged To Others In Breach Of Trust

61.     As security for her loans, the plaintiff was purportedly conveyed (on the respective dates of each bill of sale) unencumbered title to specific marble blocks.  The blocks were to

be held in trust at the Swanton Red Quarry or a Quebec processing facility until sold to generate sizeable profits that ultimately would be used to satisfy the notes. The conveyance of title as security by NCS was false and misleading because the specifically identified marble blocks purportedly conveyed to investors did not exist. The designated blocks were either fictitious, or were sold or pledged as security to others in breach of fiduciary duty. Indeed, the Canadian processor had not been sent any stone for processing since 2001, and the plaintiff was never asked to release or convey her title in the marble blocks to anyone.

### The Investment Funds Were Never Used For Their Intended Purpose

62.    The plaintiff was told that her investment funds would be used to purchase equipment. This was untrue. During the brief periods of limited activity at the Swanton Red Quarry, the quarry was operated with equipment leased from CRW, Inc., not equipment that had been purchased with investor funds. Ultimately, CRW, Inc. sued Byors for unpaid rent on the leased equipment.

63.    The plaintiff also was told by Conant at the first meeting and at various times thereafter that the investment proceeds would be used to process extremely valuable marble blocks into tile and/or slabs for very profitable sales to third parties. Conant further represented prior to the execution of each note that purchase orders were already in hand for the marble to be processed. None of this was true. As noted, there was no readily available market for the sale of marble from the Swanton Red Quarry or elsewhere and any prospects for the sale of marble blocks at any substantial profit were non-existent or extremely remote at best.

### The Investment Funds Were Misappropriated For Unauthorized And Improper Purposes

64.    The funds invested by the plaintiff pursuant to the promissory notes were wrong-fully diverted from NCS for numerous unauthorized and improper purposes including, without

limitation, those described below.

65.    On or about December 24, 2002, Byors purchased title to 150 undeveloped acres contiguous to the Swanton Red Quarry from Germain Bourdeau for $175,000.00 (this property will hereinafter be referred to as the "Bourdeau Parcel").  On or about June 23, 2003, the Byors obtained title as tenants by the entirety to an additional 60 undeveloped acres adjoining the quarry from Milton A. Robison for $125,000.00 (this property will hereinafter be referred to as the "Robison Parcel").  On information and belief, funds that the plaintiff invested pursuant to the fraudulent promissory notes were misappropriated and used to satisfy some or all of the sums due pursuant to the purchase-money mortgages held by the sellers of the Bourdeau and Robison Parcels.  Such payments were unauthorized and improper.

66.    On information and belief, some of the plaintiff's funds were misappropriated and used to make rent payments to BMC pursuant to its lease of the Swanton Red Quarry to VMIG. The memorandum of lease recorded in the land records does not disclose the terms of the lease, so the precise amount of the required rent is not known to the plaintiff.  BMC has never attempted to terminate this lease and has acknowledged to the plaintiff that VMIG is not seriously delinquent in the payment of rent.  It may reasonably be inferred that the amount of rent received by BMC to date has been substantial notwithstanding the continued inactivity at the quarry.

67.    On information and belief, throughout the term of the lease, rent payments were made to BMC utilizing investment funds obtained by Conant and Byors through the offer and sale of fraudulent promissory notes.  BMC's continued receipt of such funds was unauthorized, improper and unlawful.  BMC knew when it received the $200,000.00 payment for the exclusive option to purchase that the fair market value of the Swanton Red Quarry was only $75,000.00.

BMC also knew that the grossly inflated appraisal of $130,000,000.00 would make the grossly inflated purchase price of $4,000,000.00 appear advantageous to Byors and would be used to entice investment in the quarry. In addition, BMC provided substantial assistance to Byors during the appraisal process, answering questions posed by the appraiser and providing one of the three so-called current purchase orders that the appraiser purportedly relied on to justify the inflated $130,000,000.00 valuation of the Swanton Red Quarry. BMC was well aware that the artificially inflated appraisal would be disseminated to members of the investing public and used to entice them to invest.

68.    By the time the plaintiff was induced to invest, BMC knew that the purchase orders on which the appraisal was based were not *bona fide* and that the appraised value of the Swanton Red Quarry was massively inflated by nearly $130,000,000.00. BMC also knew that funds obtained from investors were not being used to purchase quarrying equipment or to process marble blocks into finished products for profitable sale to third parties. Despite the continued receipt of substantial payments, or perhaps because of them, BMC did nothing to warn investors or otherwise disassociate itself from this fraud. At a bare minimum, BMC recklessly and flagrantly disregarded the interests of the investing public.

69.    On information and belief, some of the plaintiff's investment funds also were misappropriated and used to make (i) lease payments on Byors' personal residence at 18 Ledgewood Drive in Williston, Vermont, (ii) some of the more than $150,000.00 in major improvements the Byors made to that property, and (iii) substantial deposits toward the purchase of the residence totaling $120,000.00. The Williston residence is titled to Hearn, a consultant to Byors' marble business who was privy to confidential information that included, among other things, the organizational structure, business plans, financial data, development activities, and marketing