```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT
```

ELIZABETH BONNIE AKERLEY,          :
                                   :
    Plaintiff,                     :
                                   :
        v.                         :   Case No. 2:05-cv-314
                                   :
NORTH COUNTRY STONE, INC., JOHN    :
BYORS, RACHEL BYORS, VERMONT       :
MARBLE INVESTORS GROUP, INC.,      :
VERMONT MARBLE INTERNATIONAL, LLC, :
BARNEY MARBLE COMPANY, INC.        :
and RICHARD HEARN,                 :
                                   :
    Defendants.                    :

<u>MEMORANDUM OPINION and ORDER</u>

     In this action alleging a fraudulent scheme to induce investment in an abandoned marble quarry, Defendants Barney Marble Company, Inc. ("BMC") and Richard Hearn have moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.  For the reasons that follow, the motions (Docs. 51 & 53) are denied.

**I.   Background**

    On November 29, 2005, Plaintiff Elizabeth Bonnie Akerley filed a nineteen count complaint alleging claims of securities fraud and related claims against John Byors and his wife Rachel Byors; North Country Stone, Inc., Vermont Marble Investors Group, Inc., and Vermont Marble International, LLC, three shell companies allegedly created by Byors to further the fraud; BMC, the owner of the Swanton Red marble quarry; and Hearn, allegedly a consultant to Byors and his businesses.  BMC and Hearn are

accused in three counts of the complaint with civil conspiracy, unjust enrichment and a civil RICO violation.

Following a three-day hearing in January 2006 on Akerley's motion for pre-judgment attachment of property, this Court issued a written decision approving attachment of property belonging to the Byors and their businesses, and refusing to approve attachment of property belonging to BMC or Hearn, on the ground that Akerley had failed at that time to show a reasonable likelihood of recovery against them, as required by Vermont Rule of Civil Procedure 4.1 governing writs of attachment.

BMC and Hearn subsequently filed answers to Akerley's complaint, and served notice upon Akerley's counsel pursuant to Federal Rule of Civil Procedure 11(c)(1)(A) that they each would move for the sanction of dismissal of the three counts against them should Akerley fail to withdraw her allegations.  Akerley did not withdraw her claims against BMC and Hearn, and their Rule 11 motions were filed May 5, 2006.  Discovery has been stayed pending resolution of the motions.

**II.  Discussion**

Rule 11 provides, in relevant part, that by filing a pleading with the court, the attorney is certifying that to the best of his "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that "the allegations and other factual contentions have evidentiary

2

support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3).  The Advisory Committee notes to the 1993 Amendments to the Rule emphasize that litigants are subject to potential sanctions for insisting upon a position after it is no longer tenable.  Fed. R. Civ. P. 11 advisory committee notes, 1993 amends.  Although a litigant may need to engage in discovery to confirm the evidentiary basis for her allegations, she has no license to join parties or make claims without any factual basis or justification.  *Id.*  "[I]f evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty not to persist with that contention," although a formal amendment to the pleadings is not required.  *Id.*

The Advisory Committee notes to the 1993 Amendments also state that a Rule 11 motion "should not be served until the other party has had a reasonable opportunity for discovery" and "should not be employed . . . to test the legal sufficiency or efficacy of allegations in the pleadings."  *Id.*

Under the revised rule, imposition of sanctions for a violation of Rule 11 is discretionary. *Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir. 1994).  Under an objective standard of reasonableness, "to warrant an award of Rule 11 sanctions on the

3

basis that a complaint is not well grounded in fact or law, 'it must be patently clear that a claim has absolutely no chance of success.'"  *Sussman v. Bank of Israel*, 56 F.3d 450, 457 (2d Cir. 1995) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986)); *accord Story v. Cello Holdings, L.L.C.*, 347 F.3d 370, 388 (2d Cir. 2003) (sanctions may not be imposed unless challenged allegation utterly lacks factual support).

Akerley's complaint alleges that John Byors and Jon Conant perpetrated an extensive fraud by informing potential investors that they were the owners and operators of marble quarries in Vermont and Canada, including the Swanton Red quarry in Swanton, Vermont.  They represented that they were in need of working capital to purchase equipment and process the marble, that they had substantial purchase orders in hand, and that investors could expect to double their money in one year.  Those who invested received promissory notes, and documents that purported to convey collateral in the form of title to marble blocks and processed tile.

According to the complaint, the representations were false, the promissory notes were fraudulent, neither Byors nor Conant intended to pay the notes, there was no viable market for the marble, the collateral was either fictitious or pledged to others, and the investment proceeds were misappropriated.

4

### A. The Case Against BMC to date

BMC owns the Swanton Red quarry. According to Akerley's complaint, it bought the quarry in April 2000 from OMYA, Inc., operator of several quarries in Vermont, for a price of $75,000. Six weeks later, in June 2000, BMC granted Byors an exclusive five-year option to purchase the quarry for four million dollars. BMC also agreed to supply Byors with all of the marble quarried from the Swanton quarry provided that Byors bought $800,000 worth of material per year. In February 2001 Byors and BMC replaced this supply contract with a written lease between BMC and one of Byors' companies, authorizing the company to perform all mining operations at the Swanton Red quarry. BMC received substantial sums for the option and the lease, and Akerley believes the money to pay BMC came from the sale of the fraudulent promissory notes.

Akerley believes that BMC through its president, Oliver Danforth, cooperated with Byors to produce the impression that the Swanton Red quarry was a going concern, when it had been abandoned for decades prior to its sale to BMC, and Danforth knew it was impossible for Byors to operate the Swanton Red quarry at a profit. Danforth is an experienced and knowledgeable quarry owner and operator, and quite familiar with the economics and regulatory requirements of marble extraction in Vermont.

An appraisal prepared in 2001 for Byors valued the quarry at $130 million, based upon an anticipated removal of 300,000 square

feet of marble per year. The appraisal indicated that Byors had seven million dollars worth of purchase orders in hand at the time of the appraisal. One such purchase order was signed by Oliver Danforth on behalf of Champlain Marble Company. Danforth has testified that he did not participate in the appraisal, nor was he aware of its contents, although he knew that Byors was having the quarry appraised, and he knew and had previously used the same appraiser. Danforth testified that the purchase order was actually a price quote.

Akerley's attorney, identifying himself as an attorney calling on behalf of a potential investor, queried Danforth about Byors and the Swanton Red quarry in July 2005. Although the evidence to date is in conflict over what exactly was said, according to Akerley's counsel, Danforth conveyed the impression that Byors was a competent quarry operator, that the quarry had been actively worked as late as 2004, that he had no idea how much marble had been removed from the quarry, and that Byors was one month late with his lease payment. Danforth had visited the Swanton quarry periodically in 2002 and 2003 to ascertain how much marble was being quarried under the lease, and had threatened termination of the lease in 2003 for four months' rent arrearage.

### B. The Case Against Richard Hearn to date

Hearn agreed to lease his house to Byors from May 1, 2002

through October 31, 2002.  On July 1, 2002, Hearn agreed to sell the house to Byors for $420,000, with a $200,000 deposit due August 15 and a closing to take place November 4, 2002.  The deposit was not paid, and the closing did not take place.  Hearn and Byors entered into a new purchase and sale agreement for the house, and the closing was eventually extended to February 18, 2003.  Although Byors failed to close on the house, and was delinquent in rent payments, he obtained Hearn's agreement to make substantial physical improvements to the property, including landscaping, construction of a spa and Jacuzzi, and kitchen renovations.  Construction began in the summer of 2003.

Byors and Hearn entered into another contract regarding the house in October 2003.  In exchange for net proceeds of $187,000 advanced by Hearn to Byors, Byors gave Hearn a note for $250,000, a mortgage on sixty acres of land adjoining the Swanton quarry, and a security interest in 9,000 square feet of marble tile.

Byors told Hearn that he was operating a marble quarry. Hearn and two associates visited the quarry in September 2002 while it was operating.  They thought it might be a good investment opportunity, and asked to see his books.  Hearn stated that he lost interest in investing when Byors admitted that he had no books.  Byors asked if Hearn could help him get bank financing, and Hearn told Byors that he should create a set of books.  Hearn gave Byors the name of his accountant and his

attorney.

Hearn was skeptical of the quarry appraisal, but did nothing more to investigate the viability of Byors' company. Byors again asked Hearn's help in financing in 2003. Byors gave Hearn bank statements, but when Hearn attempted to fill out an accounting sheet he concluded that Byors was shifting company names and holding off his creditors with promises to pay. He could not tell if the company was profitable, whether the money coming in was sales proceeds or loans or whether payments represented capital or operating expenditures. Byors had told Hearn that he was paying off borrowed money at exorbitant interest rates. Hearn stated that he concluded that Byors had a start-up company that lacked capital. He decided that he would only do business with Byors on the basis of collateralized loans, because he wasn't sure that the business was sound.

In connection with the October 2003 contract, Hearn executed a confidentiality agreement, acknowledging that he and Byors had consulted about Byors' marble business and that Byors had disclosed confidential information to him.

Byors began working with a team of consultants. Hearn was involved in conversations and meetings with the consultants concerning the state of Byors' businesses. In early 2005 they told Hearn that Byors had a substantial number of investors. Hearn was listed as having received a payment from one of Byors'

companies as an investor.  Hearn attended a meeting of Byors' creditors for the purpose of helping the consultants straighten out Byors' companies' finances.  The consultants recommended the formation of a new company, with Hearn at its head, but he declined.  Other consultants hired by Byors in 2004 and 2005 to help him manage the marble business quickly formed the conclusion that Byors did no business, or that his business was a fraud.

### C. Civil Conspiracy

Under Vermont law, conspiracy is defined as "'[a] combination of two or more persons to effect an illegal purpose, either by legal or illegal means, . . . or to effect a legal purpose by illegal means.'"  *Hooker, Corser & Mitchell Co. v. Hooker*, 89 Vt. 383, 390, 95 A. 649, 653 (1915) (quoting *State v. Stewart*, 59 Vt. 273, 286, 9 A. 559, 567 (1887)).  Although the evidence without the benefit of full discovery does not strongly support a conclusion that BMC conspired with Byors, it is not "patently clear that [the] claim has absolutely no chance of success."  *Sussman*, 56 F.3d at 457.  There is some evidence to support a conclusion that BMC and Byors colluded to acquire a non-operating quarry, inflate its value and disguise its dormant status from potential investors.

Similarly, although the evidence at this stage of the litigation of a conspiracy involving Hearn is not strong, it is not entirely unfounded.  Although Hearn has denied that he acted

as a business consultant for Byors, he has not denied that he gave him "more or less friendly, casual advice" over the course of two years.  Hearn's Reply at 3-4 (Doc. 65).  Although the parties have different views on the extent of Hearn's knowledge of Byors' business and the nature of his assistance to Byors, it is not possible to conclude from the available record that a conspiracy count has absolutely no chance of success.

To be sure, this Court concluded following the pre-judgment attachment hearing that Akerley had offered no credible evidence that would prove that Byors conspired with BMC or Hearn.  Mem. Op. & Order at 7-9.  That the evidence submitted at a pre-judgment attachment hearing would not have permitted a reasonable factfinder to conclude that BMC or Hearn conspired with Byors to defraud his investors does not mean that Rule 11 sanctions are warranted for failure to withdraw the claims.  As this Court stated, discovery may lead to persuasive evidence of conspiracy on the part of BMC or Hearn or both of them.  *Id.* at 8.  Further discovery may also demonstrate persuasively that Akerley lacks sufficient evidence to proceed against them on this count.

**D.   Unjust Enrichment**

"Under the doctrine of unjust enrichment, a party who receives a benefit must return the payment if retention would be inequitable."  *Gallipo v. City of Rutland*, 178 Vt. 244, 263, 882 A.2d 1177, 1191 (2005).  A determination of unjust enrichment

must be "based on a broad view of the human setting involved," *Legault v. Legault*, 142 Vt. 525, 531, 459 A.2d 980, 984 (1983), inquiring whether, "'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." *Gallipo*, 178 Vt. at 263, 882 A.2d at 1191 (quoting *Brookside Memorials, Inc. v. Barre City*, 167 Vt. 558, 560, 702 A.2d 47, 50 (1997) (mem.)).

Again, it is far too early a stage of litigation, with far too limited a view of the transactions among the parties, for this Court to conclude that a claim of unjust enrichment has absolutely no chance of success.

**E.   Civil RICO**

For Akerley to recover on her civil RICO count against BMC or Hearn, she must allege and prove, among other things, that BMC and/or Hearn conducted an enterprise through a pattern of racketeering activity. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004). Racketeering activity must consist of certain specified predicate acts, and to constitute a pattern, there must be two or more such acts "which 'amount to or pose a threat of continued criminal activity.'" *Id.* (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). To prove the existence of a racketeering enterprise, a plaintiff must present "'evidence of an ongoing organization, formal or informal, and . . . that the

11

various associates function as a continuing unit.'" *DeFalco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Moreover, "one is liable under RICO only . . . [by] 'participat[ing] in the operation or management of the enterprise itself.'" *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).

Akerley has not argued, in her opposition to the imposition of Rule 11 sanctions, that she has a viable civil RICO claim against either BMC or Hearn.  This appears to be a tacit acknowledgment that she has not obtained evidentiary support for her allegations of civil RICO violations against them.  *See* Fed. R. Civ. P. 11, advisory committee notes, 1993 amends. ("if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention," but "formal amendment of the pleadings to withdraw an allegation is not required").

Neither BMC nor Hearn moved, pre-answer, to dismiss for failure to state a claim or for judgment on the pleadings.  Rule 11 is not a vehicle to test the legal sufficiency of a complaint.  *Id.*

This Court does not find that a violation of Rule 11 has occurred concerning the allegations of civil conspiracy and

unjust enrichment.  Although a closer question, the Court does not find that the refusal to withdraw the civil RICO allegations against BMC and Hearn violate Rule 11, given Akerley's apparent abandonment of her claims and these defendants' apparent disinclination to challenge the sufficiency of the pleadings directly.  In any event, imposition of monetary sanctions (requested by BMC) would not be appropriate under these circumstances were the Court to find a Rule 11 violation concerning the civil RICO claims.  Accordingly, Hearn's motion for dismissal for violations of Rule 11 and BMC's motion for sanctions for violations of Rule 11 are denied.  Should the discovery process fail to produce evidence to support viable claims against BMC or Hearn, however, and the challenged allegation or claim is not withdrawn upon demand, Akerley is of course free to move again for Rule 11 sanctions.

    Dated at Burlington, Vermont this 23rd day of August, 2006.

                               /s/ William K. Sessions
                               William K. Sessions III
                               Chief Judge