# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

ELIZABETH BONNIE AKERLEY,     :
                                :
       Plaintiff,          :
                                :
       v.                :   Case No. 2:05-cv-314
                                :
NORTH COUNTRY STONE, INC., JOHN  :
BYORS, RACHEL BYORS, VERMONT    :
MARBLE INVESTORS GROUP, INC.,   :
VERMONT MARBLE INTERNATIONAL, LLC, :
and BARNEY MARBLE COMPANY, INC.,  :
                                :
       Defendants.        :

## MEMORANDUM OF DECISION

Plaintiff Elizabeth Bonnie Akerley alleges claims of civil conspiracy and unjust enrichment against defendant Barney Marble Company, Inc. ("Barney Marble").[1] The case was tried to the Court on April 27, 28, and 29, 2009, and at the end of Akerley's case, Barney Marble moved under Federal Rule of Civil Procedure 52(c) for judgment on partial findings. In a nonjury trial, "[i]f a party has been fully heard on an issue . . . and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). "In

---

[1] On February 6, 2006, default was entered against defendants North Country Stone, Inc.; John Byors; Rachel Byors; Vermont Marble Investors Group, Inc.; and Vermont Marble International, LLC. As a result, the only remaining defendant in this case is Barney Marble.

deciding whether to enter judgment on partial findings under Rule
52(c), the district court is not required to draw any inferences
in favor of the non-moving party; rather, the district court may
make findings in accordance with its own view of the evidence."
*Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006);
*see also Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55
(1990) (discussing difference between Rule 41(b), the predecessor
to Rule 52, where the court weighs evidence as the trier of
facts, and Rule 50(b), where the court draws all factual
inferences in favor of the nonmoving party).  A judgment under
Rule 52(c) must be supported by specific findings of fact and
separate conclusions of law.  *See* Fed. R. Civ. P. 52(a), (c).

The Court granted Barney Marble's motion, found judgment for
Barney Marble, and now follows up its oral opinion with the
following findings of fact and conclusions of law in support of
its Rule 52(c) judgment.

## I.   Findings of Fact

This is a tale of two stories.  One story involves Barney
Marble and a series of lucrative business transactions it engaged
in with John Byors related to the lease and purchase of a marble
quarry in Swanton, Vermont (the "Swanton quarry").  The other
story involves Akerley investing thousands of dollars in a too-
good-to-be-true investment scheme related to Byors' marble

business at the Swanton quarry.  The Court must determine what relationship, if any, there is between these stories.

A. <u>Barney Marble</u>

Barney Marble is a Vermont company co-owned and operated by Oliver Danforth.  Danforth has extensive experience in the marble industry; he worked for Vermont Marble, and its successor, OMYA, Inc., from 1960 until 1988.  After leaving OMYA, in the 1990s, Danforth purchased two quarries that had been owned or operated by Vermont Marble or OMYA:  the Goodsell and Fiske quarries in Isle La Motte, Vermont.  Danforth eventually obtained the mineral rights to the Tweed quarry in Ontario, Canada.

Danforth became involved in several business transactions with Byors over a period of years.  Danforth first met Byors in the late 1980s, when Byors attended art classes at a space owned by OMYA, the Carving Studio.  In 1988, Danforth sold some sculpture bases to Byors.  Later, in 1999-2000, Byors began contacting Danforth to request information about the sizes of blocks of stone at the Isle La Motte quarries.  Danforth would fax Byors a copy of the inventory, and Byors would select a number of blocks for purchase.  During this time period, Danforth thinks that he may have sold Byors three blocks of stone.  On at least two other occasions, Byors placed large orders for blocks, but these were later cancelled.

B.  <u>Barney Marble Acquires the Swanton Quarry</u>

Beginning in 1997, Danforth became interested in purchasing the Swanton quarry from OMYA.  The quarry is known for the five varieties of red marble it contains.  The Swanton quarry had been inactive for at least forty years, and to become operational required Danforth to obtain the necessary permits from the State of Vermont.  In the course of Danforth's negotiations with OMYA, OMYA gave Danforth permission to remove eight blocks of Swanton red marble for testing.  In July 1999, Danforth removed fifteen blocks of Swanton red marble (due to the expense he incurred in hiring an excavator to remove the blocks, OMYA allowed him to remove more than eight blocks).  The blocks were delivered to the Vermont Marble Company, the shop that Danforth was operating at the time.

In late July 1999, Byors came to Danforth's shop and expressed interest in purchasing blocks of the Swanton red marble.  Danforth does not believe that Byors discussed leasing the Swanton quarry at that time.  Danforth testified that he sold eight or nine of the Swanton red marble blocks to Byors, at $40.00 per cubic foot.  While Byors previously had bought sculpture stone from Danforth, this was the first time that Byors purchased marble blocks.  Byors made two additional purchases of Swanton red marble blocks in either late December 1999 or early January 2000.

4

The initial price OMYA offered for the sale of the Swanton quarry was $200,000. This price was reduced to $100,000, and eventually Danforth made a counter-offer of $75,000.00, which OMYA accepted. In April 2000, Barney Marble purchased Swanton Quarry from OMYA, and on June 12, 2000, Barney Marble entered into two agreements with Byors.

C.   Barney Marble and Byors' Agreements

Under the first agreement, Barney Marble gave Byors an exclusive, five-year option to purchase Swanton Quarry for four million dollars. Danforth arrived at this price based on his research of this quarry in the Vermont archives, information he learned from the General Manager of the Swanton quarry when it was operational and the State of Vermont's chief geologist. To make the quarry marketable, Danforth anticipated he would have to obtain an Act 250 permit, conduct a geological survey, perform site work, and hire drilling companies. Danforth estimated the cost for taking these steps at approximately $175,000.00.

Another factor Danforth considered was the value of marble to be removed from the quarry. Danforth sought to obtain a permit to remove 20,000 cubic feet of stone per year from the Swanton quarry. The value of this stone at $40.00 per cubic foot amounted to $800,000.00 per year. Over five years, this equals four million dollars, and this is what Danforth expected that Byors would be able to extract from the quarry. Based on his

knowledge of the marble industry and the desirability of Swanton red marble, Danforth believed that $40.00 per cubic foot was a good price and that Byors could have made money from the quarry at that price. Indeed, after Byors ended his involvement with Swanton quarry, Danforth made several sales of Swanton red marble at $50.00 per cubic foot.

For the option to purchase, Byors was to pay $200,000.00 by January 1, 2001, and Barney Marble was to provide Byors with an engineering analysis demonstrating that at least 20,000 cubic feet of high quality ore could be extracted from Swanton quarry per year, for 25 years. Barney Marble was also required to ensure that Swanton quarry complied with all local, state and federal laws governing ore extraction and shipment, and to obtain all necessary permits (transferable to Byors) for extracting up to 20,000 cubic feet of ore per year. If Barney Marble did not provide the engineering analysis and necessary compliance documents and permits, Byors could have walked away from the deal, but Barney Marble obtained the engineering analysis and the necessary permits. As part of its obligations under the terms of the option agreement, Barney Marble provided Byors with the land use permit, to which was attached a number of documents.

Byors paid Barney Marble $200,000.00 for the option to purchase Swanton Quarry. In connection with the exclusive option to purchase agreement, Byors approached Fred Blais, a local

appraiser, to evaluate the Swanton quarry. (Blais is uncertain whether Danforth referred Byors to him.) Blais testified that he was approached by Byors to conduct an appraisal of the Swanton quarry, and that Byors provided Blais with all of the information for the appraisal. Byors instructed Blais not to discuss the information Blais learned with anyone but Byors, and Byors asked Blais to rely only on the information of income potential that Byors provided Blais. While Byors was the only person from whom Blais received documents, Blais understood that some of those documents--for example, geological information, borings, pictures and samples--may have been provided to Byors by others, such as Danforth. The appraisal attached a number of supporting documents, including purchase orders. Blais valued the Swanton quarry at $130 million.

Under the second agreement, Byors agreed to purchase from Barney Marble all of the marble extracted from Swanton Quarry for a five-year period. Byors was required to buy $800,000.00 of material per year. Byors' first purchase under this agreement was for 2,000 cubic feet of material. Byors placed $80,000.00 in escrow, and eventually paid Barney Marble this amount for 2,000 cubic feet of material.

On February 28, 2001, Barney Marble and Byors entered into a new agreement. Byors' company, Vermont Marble Investors Group, Inc. ("VMIG"), agreed to lease Swanton Quarry for five years.

The rent was $200,000.00 per year to quarry up to 20,000 cubic feet of marble. If VMIG quarried more than 20,000 cubic feet of marble, VMIG agreed to pay Barney Marble $10.00 per cubic foot as a royalty.

D. Byors Operates the Swanton Quarry

Danforth testified that his practice was to try to visit the Swanton quarry periodically in order to document what was extracted. Danforth and Robert Ley, the co-owner of Barney Marble, would take measurements and photographs of the quarry. Danforth said that he was able to visit the Swanton quarry in 2001, but then Byors curtailed Danforth's visits. Byors required Danforth to make an appointment to visit the site in Byors' presence. Danforth estimated that over 19,000 cubic feet of stone was removed from the Swanton quarry in 2001.

Based on the facts stipulated to by the parties, between 2001 and 2003, a conservative estimate of the total amount of stone removed from the Swanton quarry is approximately 40,000 cubic feet. At $40.00 per cubic foot, the value of this stone is approximately $1.6 million dollars. The parties have further stipulated that Byors paid Barney Marble a total of $749,655.00 between November 28, 2000 and May 25, 2004 for the option to purchase, the purchase of stone, and the annual rent of the Swanton quarry.

On February 23, 2004, Danforth, on behalf of Barney Marble, sent Byors a letter regarding late rent payments for the Swanton quarry. Later that spring, Barney Marble and Byors re-negotiated the terms of Byors' lease of Swanton quarry because of Byors' late rent payments. Danforth testified that the new terms called for quarterly, rather than monthly, payments. In July 2004, Barney Marble and Byors terminated the exclusive option to purchase agreement.

E.   Danforth and Byors' Other Transactions

Danforth had additional transactions with Byors involving the Tweed quarry in Canada and the Goodsell quarry in Isle La Motte. In June 2002, after acquiring the mineral rights to the Tweed quarry, Danforth and Byors began negotiations for Byors to lease or purchase this quarry. In 2006, Danforth sold Byors all of the marble inventory in the Tweed quarry for $150,000.00. Danforth believes that this consisted of 260 blocks; however, Danforth hadn't measured the blocks, so he could not determine how many cubic feet of stone was sold in this transaction. Also, when the company leasing the Goodsell quarry from Danforth ended its lease in the fall of 2003, Danforth entered negotiations with Byors for the purchase of the Goodsell quarry, and Danforth agreed to give Byors an option to purchase the quarry, which was never executed.

F.   <u>Akerley Learns of Byors' Marble Business</u>

Akerley is a resident of Gloucester, Massachusetts.  Over the years, Akerley has owned and operated a commercial fishing business and assisted in running a construction company involved in commercial and residential projects.  Akerley also has experience investing in real estate and the stock market.  Akerley invested significantly in the stock market in a margin account managed by a broker at Morgan Stanley.  Akerley testified that she was very actively involved in selecting speculative stocks and that she spoke with her broker almost daily.  Akerley described some of her stock selections as "crazy" "high tech" stocks, and at times, her broker tried to talk Akerley out of making some of the investments that she made.  In 2001, Akerley suffered a large loss of funds in the stock market.

Akerley met Angelo Zakas when she was eighteen or nineteen years old.  Zakas was a realtor in Gloucester through whom Akerley purchased an apartment building in 2001.  Akerley shared information about her financial losses with Zakas, and at some point during or after Akerley's purchase of the apartment building, Zakas mentioned a business opportunity available through his friend, Jon Conant, a local attorney.

In December 2002, Akerley met Conant at Zakas' home; Conant, Zakas, Akerley, and Zakas' wife were present.  The business opportunity involved investing in North Country Stone, Inc.

("NCS"), a company that operated a marble quarry in Swanton, Vermont. Conant and Byors were partners in NCS, and Akerley understood that they jointly owned the Swanton quarry and that Byors managed and operated the quarry. Over several meetings, Conant presented information about the marble business and provided samples of tile and stone from the quarry, along with several contracts for stone. Conant also showed Akerley the Blais Appraisal. Conant explained that he needed investor funds to purchase and maintain the equipment required to operate the quarry and process the extracted stone.

Akerley found Conant to be knowledgeable and she was impressed with his presentation. Conant had a good reputation in the community as a high school hockey coach and a Harvard-educated lawyer who represented a number of local banks. Akerley recalls three meetings with Conant at Zakas' home before she made her first investment. Conant explained that her funds would be used to purchase saws, loaders, crushing machines and other equipment, and he represented that the rate of return on her investment would be 100% over one year. At the time, Akerley thought that this rate of return seemed extreme, but Akerley had experience with businesses that required cash on a short-term basis and that borrowed through non-traditional lenders. In Akerley's experience, the typical rate of return from a non-traditional lender was 25%; to Akerley, 100% seemed exorbitant,

but possible.  Prior to investing with Conant and Byors, Akerley had invested a fair amount of money in real estate and the stock market, and she had never received a rate of return as high as that proposed by Conant.

Akerley did not independently verify what she was told by Conant or Zakas.  Akerley relied entirely on their representations, and eventually she agreed to invest in NCS.  The factors that she took into account included Conant's presentations, the Blais Appraisal, the samples of stone, and Zakas' recommendation.  In her testimony in *Akerley v. Conant*, No. 06-11306 RWZ (D. Mass. 2008), Akerley stated that the fact that Zakas was investing was material to her decision to invest. Akerley believed that she could make back the money that she lost in the stock market in order to send her sons to college.

G.   Akerley Invests

Between January 2003 and March 2004, Akerley made nine investments in the form of loans to NCS.  Each of the loans was documented by an investment agreement, a note evidencing the funds loaned, and a bill of sale.  The bills of sale reflect the security for Akerley's loans--marble blocks.  Akerley's understanding was that these marble blocks were not just from the Swanton quarry, but also from other quarries, such as the Goodsell quarry in Isle La Motte or a quarry in Canada.  Akerley further understood that these marble blocks would be processed

and that she would receive the revenue from their sale. Akerley
never saw the blocks and was never told that the blocks were sold
or that any revenue had been generated from them.

The agreements that Akerley signed memorializing her
investments noted that the marble blocks securing the loans would
be held at Swanton quarry or at a processing site in Canada.
Under the agreements, there is no mention of the blocks being
stored or held at any other location. Akerley admitted that she
hadn't read through the entirety of the agreements.

Conant prepared all of the loan and investment documents.
After making an initial investment of $50,000.00 on January 17,
2003, Akerley made additional investments in February, March and
June 2003 as a result of discussions that Akerley had with Conant
and Zakas. In mid-February 2003, Conant told Akerley that the
business needed more money for processing stone and "getting the
product out," and that Byors was in Dubai getting contracts for
the purchase of the stone. In this way, Akerley made a number of
additional investments; Akerley explained that usually Zakas
approached Akerley and said that there was a need for more money
to buy equipment, and that they were on the verge of making money
and that everyone would be paid back.

As determined in *Akerley v. Conant*, Akerley invested a total
of $545,000.00 with Conant and Byors, minus $32,000.00 in
principal and interest that was paid back to her. In some cases,

Akerley invested jointly with Zakas, but she later learned that the checks Zakas provided were never cashed. Akerley's checks were all cashed. At some point, Akerley became suspicious and questioned Zakas about whether he was receiving commissions for encouraging her to invest; Zakas denied this. On at least one occasion when Akerley invested alone, and Zakas later learned of this, Akerley testified that Zakas became upset because he was not included. According to Akerley, Zakas hounded her to invest, and called her many times a day.

H.   The Notes Become Due

The first of Akerley's notes came due in August 2003, and Akerley became concerned because she was not paid. Akerley talked with Zakas and Conant about collecting her money. When Akerley spoke with Conant, he told her that NCS was still using her money, and that NCS was about to start making money from their many contracts in Dubai and China. Around August 18, 2003, Akerley believes that she received approximately $10,000.00 from Conant.

Akerley continued to make significant investments even as the notes became due and were not paid. On January 26, 2004 Akerley invested $325,000.00; on February 20, 2004 she invested $50,000.00, and on March 5, 2004 she invested $25,000.00. At the time that Akerley made the January 2004 investment, the outstanding notes were "rolled over" and combined into one

agreement.  When all of the notes became due on the rollover note, Akerley was not paid, and she hired an investigator to locate the marble blocks that were the collateral for her loans. Akerley does not know where any of these marble blocks are located.

    I.    Conant and Byors' Scheme Becomes Apparent

    During the time that Akerley made these investments, she never met Byors, but learned about him from Conant and Zakas. Akerley testified that Zakas specifically instructed her not to contact Byors.  At some point, Akerley grew concerned and called Byors' home and spoke with his wife, who told Akerley that Byors would return her call, which he never did.  When Zakas learned that Akerley had attempted to contact Byors, he became upset with her.

    Conant filed for bankruptcy in October 2004, and Akerley was not listed as one of Conant's creditors.  At the end of 2004 or the beginning of 2005, Akerley discussed with Zakas the possibility of filing suit to recover her money.  Zakas told her to wait because Conant was planning on paying them, so they shouldn't raise the issue of not being listed as creditors in his bankruptcy proceeding.  In 2005, Akerley learned for the first time that in April 2003 Conant had been sued by another investor, Hilda Ayer, to recover $600,000.00.

    In June 2003, Conrad Meub, a management consultant, was

hired by William Meub (Byors' attorney at the time) to perform forensic accounting, tax analysis, and business planning services for Byors.  Through his review of Byors' records, Meub identified 150 investors in Byors' business as of spring 2004, but Akerley was not identified as one of these investors.  Meub determined that between January 1, 2000 and December 31, 2004, 10 to 15 million dollars was deposited in Byors' accounts, and that there were approximately 3 to 3.5 million dollars in business expenses. Meub also found that Conant and Byors had a close business relationship, and that millions of dollars passed back and forth between them, although Meub does not believe that Conant had signing authority on Byors' accounts.  Both Conant and Byors recruited investors; Conant would seek out investors and provide funds to Byors, and Byors would provide funds to Conant to repay investors or for Conant's use.  Based on his analysis, Meub believed that the sources of Byors' financing were small, unqualified, and unaccredited investors, such as friends and family.

Working with Byors, Meub found that Byors was not forthright and was extremely secretive.  For example, Byors told Meub that there were investors in his marble business, but Byors wouldn't disclose the character or any specific information about these investors.  Similarly, Byors specifically requested that Meub not contact any customers with whom Byors was working; Byors

repeatedly told Meub to stay out of his contracts with customers in Dubai.  Meub's impression was that Byors was trying to control information.  Byors also misrepresented key facts:  Byors told Meub that he owned or leased a quarry in Isle La Motte when in fact he did not.  And, when Meub went to Canada to inspect quarries in which Byors was involved, Byors expressed concern about Meub visiting certain companies, such as a stone fabricator.  Meub believes this was because Byors owed the fabrication company money.

     J.    <u>Akerley, Danforth, and this Litigation</u>

Akerley first heard of Danforth in December 2004; she learned of him from Holly Cain, another investor in Conant and Byors' business, when the two of them were reviewing the Blais Appraisal.  After Akerley's notes to NCS became due and she was not paid, Akerley never tried to contact Danforth.  There is no evidence that Akerley and Danforth had any contact before this litigation was initiated.

On the eve of trial, Akerley was introduced to another Gloucester investor in Conant and Byors' scheme, Michael Porper.  Akerley and Porper met for the first time on April 25, 2009, two days before the trial in this case began.  Porper testified that he invested approximately $600,000.00 in NCS, and believes that he received between $85,000.00 and $125,000.00 from Byors.  According to Porper, prior to loaning $200,000.00 to Conant and

Byors, Porper told them that he wanted to meet Danforth or to visit the quarrying operations in Vermont. Porper needed assurances that he was investing in a profitable venture.

To allay Porper's concerns, Porper testified that two to six weeks before he invested $200,000.00 on October 8, 2004, Byors picked him up in a vehicle, and they drove to Winchester Court in Gloucester. Porper was in the back seat of the vehicle, an unidentified man was seated in the front passenger seat, and Byors was driving. Byors told Porper that they would be calling Danforth together, and Byors then used his cell phone to call someone who Byors greeted as "Ollie." Byors activated the speaker phone on the cell phone, and explained to "Ollie" that Porper needed assurances before making an investment in the marble business. According to Porper, "Ollie" put Porper at ease, since he seemed knowledgeable about the marble business, reassured Porper that the marble blocks were worth the value Byors was quoting, and told Porper that his money was good and that he would make money. Porper did not speak directly to "Ollie." Byors did the talking, and Porper estimates that the call lasted five to ten minutes. Porper says that he was reassured by the call and agreed to make the investment.

At the time that he testified, Porper said that he could not identify Danforth's voice. After Porper had the opportunity to listen to Danforth testify, Akerley's counsel re-called Porper,

who then testified that after listening to Danforth, Porper was certain that the voice he heard on Byors' cell phone in the car in 2004 was Danforth's.

## II. Conclusions of Law

### A. Civil conspiracy

Under Vermont law, "[t]he crime of conspiracy consists in a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, or to effect a legal purpose by illegal means." *Boutwell v. Marr*, 42 A. 607, 609 (Vt. 1899). For a civil action, the plaintiff must be damaged by something "done in furtherance of the agreement, and "the thing done [must] be something unlawful in itself. . . . [T]here can be no recovery unless illegal means were employed." *Id.*

The conspiracy at the heart of this case is a scheme by Conant and Byors to seek out investors in the Gloucester area for their purported marble business. As Meub testified, Conant and Byors had a very close business relationship and records reflect that millions of dollars passed back and forth between them. Akerley was one of many investors, and she lost over $500,000.00 that she loaned to Conant and Byors with the expectation of receiving an extraordinary 100% rate of return. Akerley's theory is that Barney Marble was part of Conant and Byors' scheme, but there is simply no evidence to support this view. In fact, the evidence shows just the opposite.

Byors was an "operator" and had an extremely secretive nature. There are many examples of how Byors controlled and restricted access to information about his business dealings. Meub testified that Byors was not forthright with him and that Byors specifically instructed Meub not to contact any of his customers or any of the parties involved in the Dubai contracts. Blais testified that Byors instructed him not to discuss the information Blais learned for the appraisal with anyone but Byors. Byors also asked Blais to rely only on the information of income potential that Byors provided Blais. Danforth testified that although his normal practice was to conduct site visits at the quarries he owned, after 2001 Byors restricted Danforth's site visits to the Swanton quarry by requiring Danforth to make appointments to visit only while Byors was present. Akerley herself testified that she never met Byors and that Zakas specifically instructed her not to contact Byors. Given Byors' secretive nature, the Court does not credit the implication that Byors must have shared the details of his and Conant's scheme with Danforth. None of the evidence supports such a finding.

Danforth testified extensively about Barney Marble's business dealings with Byors. Danforth, and later, Barney Marble, sold Byors marble blocks from several of the quarries that Danforth and/or Barney Marble owned or controlled. Although Akerley repeatedly and strenuously argued that these were not

arm's-length transactions, Akerley offered no credible evidence--
Akerley did not put on a single expert witness--that Byors paid
less than fair market value for these marble blocks.  Further,
Danforth testified that after Byors left the Swanton quarry, he
sold Swanton red marble for an even higher price than he had
charged Byors for the same stone; $50.00 per cubic foot, as
opposed to $40.00 per cubic foot.

Akerley also suggested that the agreements related to the
Swanton quarry that Byors and Barney Marble entered into were
improper.  Akerley contended that the sale price of $4 million
under the exclusive option agreement and the $200,000.00 per year
rent due under the lease agreement were overvalued, and that the
price of $40.00 per cubic foot for Swanton red marble was too
high.  In particular, Akerley argued that the disparity between
the $75,000.00 Barney Marble paid to acquire the Swanton quarry
from OMYA and the purchase price of $4 million reflected in the
exclusive option agreement is suspicious.  Aside from argument
and inference, however, Akerley offered no evidence through any
witness or document that any of these values were improper.

While the price differential between what Barney Marble paid
for the Swanton quarry and the $4 million purchase price in the
option agreement is unusual, this alone is not evidence of a
conspiracy.  Danforth testified credibly about the factors that
he considered in developing the exclusive option to purchase and

the lease agreement for Swanton quarry.  Since the Swanton quarry
had been inactive for forty years, Danforth estimated that Barney
Marble would incur approximately $175,000.00 to make the quarry
marketable by obtaining the necessary permits and conducting a
geologic survey and other analyses.  As an historical quarry,
Danforth also explained that he conducted research on the quarry
through the Vermont archives.  He relied on experts in the field
who had experience with the Swanton quarry.  Danforth's former
supervisor at OMYA had been the General Manager of the Swanton
quarry when it was operational, and Danforth consulted the State
of Vermont's top geologic expert, who was also familiar with the
Swanton quarry.

Akerley offered Meub's testimony as a critique of the values
Barney Marble set for the exclusive option to purchase and the
lease of the Swanton quarry, but Meub was not qualified as an
expert on these issues.  Meub's testimony was permitted for the
limited purpose of describing what information Meub conveyed to
Byors as a result of his analysis of Byors' business.  Meub could
not offer an opinion on the value of Byors' agreements with
Barney Marble or the value of Swanton quarry or its marble.
Without an expert to provide such evidence, Akerley has nothing
to support her inferences regarding Byors' business dealings with
Barney Marble.

More importantly, the record completely lacks any facts that

demonstrate that Barney Marble knew a single detail about the nature of Byors' business or scheme to seek out investors, let alone that it was involved in a conspiracy to defraud them. Danforth testified repeatedly that Byors never discussed such matters with him and that he had no knowledge of Byors' business dealings. Akerley herself testified that she never communicated with Danforth and had never even heard of Danforth until December 2004, when she heard his name from Holly Cain. Indeed, Barney Marble's February 2004 letter to Byors demanding back rent is entirely inconsistent with Barney Marble as a co-conspirator, with knowledge of Byors' scheme, and performing acts in furtherance of the objective of the conspiracy.

The record also shows that between 2001 and 2003, Swanton quarry was operated as a business and that at least 40,000 cubic feet of stone was extracted during that time. These calculations are based on figures to which the parties stipulated, and they derive from an affidavit submitted by Akerley of a person who worked at the Swanton quarry from 2001 to 2003. Given the evidence of the amount of stone removed from Swanton quarry and its value of approximately $1.6 million (40,000 cubic feet at $40.00 per cubic foot), Akerley's argument that Danforth should have known that the Swanton quarry was not a viable business cannot be credited. Similarly, Akerley's suggestion that Barney Marble was involved in a conspiracy with Byors because Danforth

referred Byors to Blais as an appraiser carries little weight. Blais testified that he did not speak or obtain information from Danforth as he prepared his appraisal, and Danforth testified that he took no part in preparing the appraisal. Moreover, Byors specifically instructed Blais not to seek information from anyone but himself. What Danforth "should have known" about Byors' business and Danforth's referring Byors to Blais do not a conspiracy make.

The only link Akerley offered between Barney Marble and Byors' scheme to lure investors was the eve-of-trial witness, Porper. While the Court found Porper's testimony credible, in that Porper had discussions with Byors about investing in the marble business and the 2004 car ride where Byors called "Ollie" on his cell phone to reassure Porper to invest $200,000.00 in the marble business, it is questionable whether the 2004 conversation took place with Danforth. This was a five to ten minute conversation that took place in a vehicle four and a half years ago through the speaker on a cell phone. The Court does not find credible Porper's identification of Danforth's voice as the voice of the person whom Byors addressed as "Ollie". Not only was the call of short duration, and through the speaker of a cell phone, but Porper could not offer any personal details from the conversation, other than its subject, that suggest that "Ollie" and Danforth are the same person. The evidence is equally

suggestive, given the nature and extent of Byors' and Conant's
fraud, that they enlisted someone to play "Ollie" in order to
allay Porper's concerns.

Akerley has not met her burden of proof.  There is no
evidence to support a conspiracy claim against Barney Marble.

B.    Unjust enrichment

To prove unjust enrichment under Vermont law, a plaintiff
must establish: (1) that a benefit was conferred on the
defendant; (2) the defendant accepted the benefit; and (3) it is
inequitable to allow the defendant to retain the benefit.
*Johnson v. Harwood*, 945 A.2d 875, 881 (Vt. 2008).  "[T]he inquiry
is whether, in light of the totality of the circumstances, equity
and good conscience demand that the defendant return that which
the plaintiff seeks to recover."  *Id.* at 881-82 (quoting
*Brookside Mem'ls, Inc. v. Barre City*, 702 A.2d 47, 50 (Vt.
1997)).

As described above, the Swanton quarry was a functioning
quarry between 2001 and 2003.  By stipulation of the parties, a
conservative estimate of the amount extracted from the quarry is
40,000 cubic feet of stone.  At the rate of $40.00 per cubic
foot, the value of the extracted marble amounts to $1.6 million.
Also by stipulation of the parties, between November 2000 and May
2004, Byors paid Barney Marble $749,655.00 for the exclusive
option to purchase, the purchase of stone, and the annual rent

25

related to Swanton quarry. Even if the value of stone removed from Swanton quarry is discounted to reflect costs of production, the amount that Byors paid Barney Marble is significantly lower than the value of the stone. To the contrary, it appears from these figures that more stone was extracted than Barney Marble was paid for. Thus there is no evidence that a benefit was conferred on Barney Marble that would be inequitable for Barney Marble to retain.

There is simply no evidence before the Court to support Akerley's claim that Barney Marble was unjustly enriched.

## CONCLUSION

For the reasons explained above, the Court enters judgment for Barney Marble on Akerley's claims of civil conspiracy and unjust enrichment. Execution of the judgment is delayed until the date that this written opinion is issued.


Dated at Burlington, Vermont this 6th day of May, 2009.


/s/ William K. Sessions III
William K. Sessions III
Chief Judge